UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

TRACEY MATTHEW,

                Plaintiff,

v.

JP MORGAN CHASE BANK, N.A.,

                Defendant.

**MEMORANDUM AND ORDER**

17-CV-3594 (LDH) (ST)

---

LaSHANN DeARCY HALL, United States District Judge:

Plaintiff Tracey Matthew brings this action against Defendant JP Morgan Chase Bank, N.A. alleging violations of the Americans with Disabilities Act (the "ADA"). Defendant moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment on all of Plaintiff's claims.

**BACKGROUND**[1]

Plaintiff was employed by Defendant at its branch located on Church and Utica Avenues in Brooklyn, New York (the "Branch") from 2008 to July 11, 2013. (Def.'s Rule 56.1 Statement

---

[1] The foregoing facts are undisputed unless otherwise noted. Further, facts that were not contradicted by citations to admissible evidence are deemed admitted. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 Statement, that fact will be deemed admitted."). Importantly, Local Rule 56.1 requires the party opposing a motion for summary judgment to respond to each of the moving party's statements and to include any "additional material facts" in "a separate, short and concise statement" to which the moving party may respond. Local Rule 56.1(b). Consistent with this Rule, this Court's Individual Practice III.6(e) requires an opposing party to "include additional materials facts alleged to be in dispute . . . [to] do so in a separately titled but consecutively numbered section" of the 56.1 Statement. In this case, Plaintiff failed to offer additional material facts in a separately titled section to which Defendant could properly respond. In an attempt to address Plaintiff's improperly asserted additional facts, Defendant filed a Reply 56.1 Statement. (*See* ECF No. 63.) With seemingly selective awareness of the Local Rules and the Court's Individual Practices, Plaintiff moved to strike Defendant's Reply 56.1 Statement, arguing that a moving party is only permitted to respond to a separate opposition statement. (*See* ECF No. 64.) The Court granted Plaintiff's Motion to Strike Defendant's Reply and indicated that it would sua sponte strike any additional alleged facts in Plaintiff's Response to Defendant's 56.1 Statement that are not set forth in a separately titled but consecutively numbered section as required.

with Pl.'s Resps. ("Def.'s 56.1") ¶¶ 1–2, ECF No. 60.) In May 2012, Plaintiff was promoted to Branch Manager and was responsible for the operation of the entire branch. (*Id.* ¶¶ 2–3.)

In July 2012, Market Manager Anna Kang was responsible for conducting Plaintiff's mid-year performance review. (*Id.* ¶¶ 5–7.) Before conducting the review, Kang informed her direct report, District Manager Trainee John Wolf, of an incident in which Plaintiff had directed a banker to open an account after banking hours for Plaintiff's neighbor, who was not present at the Branch, using Plaintiff's personal funds to finance the account. (*Id.* ¶¶ 7–8.) Wolf, who had not yet met Plaintiff, found that the incident constituted a violation of Defendant's policies and procedures and recommended that Plaintiff be terminated. (*Id.* ¶¶ 9–10.) Human Resources Business Partner Julie Ginsburg also believed that Plaintiff should be terminated. (*Id.* ¶ 15.) Notwithstanding these determinations, Kang and Wolf decided to retain Plaintiff because there had been no District Manager in place at the time of the incident to provide Plaintiff with guidance. (*Id.* ¶ 16.) Accordingly, Kang and Wolf issued a written warning. (*Id.* ¶ 17.)

During Plaintiff's mid-year performance review, conducted on July 31, 2012, Kang and Wolf provided Plaintiff with the written warning. (*Id.* ¶ 19.) Plaintiff agreed that, based on her conduct, Defendant could have discharged her. (*Id.* ¶¶ 20–21.) Plaintiff also acknowledged, in writing, that any other performance issues could subject her to further corrective action, including termination. (*Id.* ¶ 23.) Plaintiff did not contest the written warning, which resulted in a 60-day restrictions period. (*Id.* ¶¶ 25–26.)

On October 12, 2012, Plaintiff received a second written warning for a violation of policies and procedures when she instructed a banker to withdraw significant funds from a client account without the client present. (*Id.* ¶ 28.) Wolf and Human Resources determined that the incident constituted a dischargeable violation, and Wolf again issued the written warning in lieu

2

of recommending Plaintiff's termination. (*Id.* ¶¶ 29, 31.) When delivering the warning to Plaintiff, Wolf explained that Plaintiff's actions constituted a terminable offense, and Plaintiff understood that Defendant viewed her actions as a violation of its policies and procedures. (*Id.* ¶¶ 33–34.) Plaintiff did not contest the second written warning and acknowledged, again in writing, that she could be subjected to further corrective action, including termination, if other performance issues developed. (*Id.* ¶¶ 35–36.)

At some point prior to 2013, Plaintiff was diagnosed with hypertension. (*Id.* ¶ 97.) In January 2013, Plaintiff's physician directed her to resume taking her hypertension medication, which she had not taken in months. (*Id.* ¶ 98.) Plaintiff's physician did not tell her that she was unable to work, or that she needed to reduce her work schedule. (*Id.* ¶ 102.)

On February 15, 2013, Chase Field Operations Services Coach Leandra Parbhoo conducted a standard Field Operations visit to the Branch. (*Id.* ¶ 47.) During the visit, Parbhoo observed multiple policy, procedure, and safety violations, including a vault door that was left open, unlocked cash boxes, and other issues that appeared to result from Plaintiff's "lack of oversight." (*Id.* ¶¶ 48–49.) Parbhoo emailed Plaintiff regarding these concerns, which Plaintiff understood constituted serious violations. (*Id.* ¶¶ 48–50, 60.) As a result of the visit, on March 1, 2013, the Branch was placed on Early Warning, which signifies that a branch would fail an internal audit. (*Id.* ¶¶ 51–52.) On or about February 19, 2013, Wolf conducted Plaintiff's annual performance review for the January 2012 through December 2012 period. (*Id.* ¶ 38.) Plaintiff's overall performance rating was "low meets expectations," which Plaintiff did not contest. (*Id.* ¶¶ 40, 43.) After the Branch was placed on Early Warning, Plaintiff did not take the steps necessary to resolve the identified policy violations. (*Id.* ¶ 62.)

3

On March 13, 2013, during another branch visit, Parbhoo observed additional policy violations, including infractions in the Branch's cash controls, monetary transactions, security and account opening and closing documentation. (*Id.* ¶¶ 53–54.) Sometime in March 2013, Plaintiff took one day off from work. (*Id.* ¶ 103; Pl.'s Reply ¶ 103.) The parties dispute whether Plaintiff told Wolf that she was out sick because of her elevated blood pressure. (Def.'s 56.1 ¶ 103; Pl.'s Reply ¶ 103.) On April 24, 2023, and May 30, 2023, during additional field visits, Parbhoo identified more safety and procedure violations including, among other things, bankers carrying cash across the bank floor during business hours. Parbhoo again emailed Plaintiff regarding the concerns. (Def.'s 56.1 ¶¶ 59–60.) Plaintiff did not believe that Parbhoo's feedback was in any way motivated by unlawful discrimination. (*Id.* ¶ 64.) Plaintiff never complained to Parbhoo about any medical issues, illnesses, or ailments. (*Id.* ¶ 69.)

At some point in 2013, the Branch's Assistant Branch Manager ("ABM") took family medical leave. (*Id.* ¶ 130.) Wolf was not authorized to hire a new ABM while the permanent ABM was on family medical leave. (*Id.* ¶ 131.) Plaintiff maintains and Defendant disputes that Plaintiff requested additional coverage. (*Id.* ¶ 138; Pl.'s Reply 56.1 ¶ 138.) The parties' also dispute the extent to which Wolf secured temporary ABM coverage during this period. (Def.'s 56.1 ¶¶ 134–40; Pl.'s Reply 56.1 ¶¶ 134–40.) At the time that Plaintiff worked as a branch manager, branch managers often worked without an ABM for three to four months at a time, and not every Chase branch had an ABM. (Def.'s 56.1 ¶¶ 142–43.)

In May 2013, branch tellers requested a meeting with Wolf to discuss problems that they were having with Plaintiff, including a "negative climate" in the Branch. (*Id.* ¶¶ 70–71.) A meeting was scheduled that month for the tellers, Wolf, and Plaintiff to discuss the issues. (*Id.* ¶ 73.) Plaintiff failed to attend. (*Id.* ¶ 75.) By the end of 2013, Wolf determined that Plaintiff was

4

not improving as a Branch Manager.  (*Id.* ¶ 81.)  Thereafter, Wolf conferred with Human Resources to discuss his formal request to discharge Plaintiff.  (*Id.* ¶ 82.)  On June 20, 2013, and June 24, 2013, Wolf drafted a "Recommendation For Termination" for Ginsburg's and Human Resources' review.  (*Id.* ¶ 83.)  On July 2, 2013, the termination document received final approval.  (*Id.* ¶ 85.)

On July 3, 2013, Plaintiff informed Wolf that she would be out sick for the following week, through July 9, 2013.  (*Id.* ¶ 87.)  The parties dispute whether Plaintiff specified why she was calling out sick.  (*Id.* ¶ 88; Pl.'s Reply 56.1 ¶ 88.)  The parties dispute whether Plaintiff previously told Wolf that she needed to take time from work for medical reasons.  (Def.'s 56.1 ¶ 89; Pl.'s Reply 56.1 ¶ 89.)  However, it is undisputed that Plaintiff never provided anyone at Chase with any documentation indicating that she had been diagnosed with or suffered from hypertension, or any medical condition, before July 10, 2013.  (Def.'s 56.1 ¶ 112.)  In particular, on July 10, 2013, Plaintiff informed Wolf's assistant, for the first time, that she had a document titled, "Disability Certificate" for July 3, 2013 through July 9, 2013 and provided it to the Medical Leave Unit of Human Resources.  (*Id.* ¶ 110.)  The Disability Certificate stated that Plaintiff had uncontrolled hypertension.  (*Id*. ¶ 111.)  On July 11, 2013, Wolf read the Recommendation for Termination document to Plaintiff and discharged her.  (*Id.* ¶ 93.)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138,

5

148 (2d Cir. 2004). Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Celotex Corp.*, 477 U.S. at 325. Once the movants meet their initial burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts, *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996). That is, the non-movant cannot survive summary judgment by relying on the same conclusory allegations set forth in her complaint. *See Murphy v. Lajaunie*, No. 13-CV-6503, 2016 WL 1192689, at *2 (S.D.N.Y. Mar. 22, 2016) (citing *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)).

## DISCUSSION

Congress enacted the ADA, in part, "to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C.A.§ 12101(b)(4). Within the workplace, the "ADA prohibits discrimination against an otherwise qualified employee on the basis of her disability." *Goonan v. Fed. Reserve Bank of N.Y.*, No. 12-CV-3859, 2014 WL 3610990, at *4 (S.D.N.Y. July 22, 2014). Specifically, the ADA states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . advancement, or discharge of employees, . . . and other term, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *McBride v. BIC Consumer Prod. Mfg. Co.,* 583 F.3d 92,

96 (2d Cir. 2009).  The *McDonnell Douglas* framework entails a three-part analysis, under which a plaintiff must first "establish a prima facie [discrimination] case." *Id.*  Next, the employer must offer, through the introduction of admissible evidence, a legitimate non-discriminatory reason for the alleged unlawful conduct. *Id.*  Then, the plaintiff must ultimately "produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Id.*

## I.   Plaintiff's Failure to Accommodate Claim

Defendant argues that it is entitled to summary judgment as to Plaintiff's failure to accommodate claim because the record indisputably reflects that Defendant had no notice of Plaintiff's alleged disability.  (Def.'s Mem. at 23–25.)   The Court agrees.

To establish a *prima facie* case for failure to accommodate, a plaintiff must show that: (1) she is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of the job at issue; and (4) the employer refused to make such accommodations.  *McBride*, 583 F.3d at 97 (citation omitted).

Plaintiff asserts that Defendant had notice of her alleged disability because she told her supervisor, Wolf, on multiple occasions, that she needed time off to recover from her hypertensive condition, but the record does not so reflect.[2]  It is true that according to Plaintiff's deposition, she informed Wolf in March 2013, that she "wasn't feeling well because [of her] blood pressure." (*See* Decl. of Locksley Wade in Opp'n to Def.'s Mot. Summ. J. ("Wade Decl."), Ex. 3 (Matthew Tr. 112–13), ECF No. 62-3.).  This is insufficient to establish that Defendants

---

[2] Defendant states that Wolf told Plaintiff that he would "make sure [to] get [her] the help" if she needed additional support at the Branch.  (Def.'s 56.1 ¶ 129 (citing Decl. of Shira Blank in Supp. Def.'s Mot. Summ. J. ("Blank Decl."), Ex. B (Wolf Tr. 417:25-418:5).)  In response, and in direct contravention of Local Rule 56.1 and the Court's Individual Practices as discussed *supra* n.1, Plaintiff asserts new material facts regarding her alleged requests for accommodation of her hypertensive condition.  (Pl.'s Reply 56.1 ¶ 129 (citing Wade Decl., Ex. 6 (Pl.'s Aff.), ¶¶ 11–17, ECF No. 62-6.).)  Because Plaintiff failed to assert these additional material facts in a separate section as required, the Court declines to consider them.

7

were on notice that Plaintiff suffered from a disability connected to her blood pressure. Indeed, "an employer's knowledge of a plaintiff's symptoms does not establish, as a matter of law, that it knew the plaintiff was disabled." *Cozzi v. Great Neck Union Free Sch. Dist.*, No. 05-CV-1389, 2009 WL 2602462, at *14 (E.D.N.Y. Aug. 21, 2009). And, apart from this March 2013 instance, the record makes plain that Plaintiff informed her supervisor of her hypertensive condition only one other time, on July 2, 2013, *after* Defendant's decision to terminate her employment.[3] (*See* Wade Decl., Ex. 3 (Matthew Tr. 112–13); Wade Decl. Ex. 2 (Matthew Tr. 308–12), ECF No. 62-2.) Plaintiff insists that Defendant should have inferred her alleged disability when she was absent from an important staff meeting. (*See generally* Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 43; Aff. of Locksley Wade in Opp'n to Def.'s Mot. Summ. J. ¶¶ 9–10; Aff. of Pl. in Opp'n to Def.'s Mot. Summ. J. ¶ 3, ECF No. 43-2.) But, nothing in the record reflects that Plaintiff indicated that her absence was due to her medical condition. That Plaintiff took only one day off to recover from her hypertensive condition only undermines her claim that Defendant should have known that she was disabled within the meaning of the ADA. *See Cozzi*, 2009 WL 2602462, at *15 (holding that an employer was not put on notice of the plaintiff's disability where she "was taken to a local emergency room for brief treatment," reported to work the following day, and "there [wa]s no evidence that she ever again mentioned what had happened or subsequently raised with her supervisors any issue regarding her physical condition"). Thus, the record is insufficient to support a showing that Defendant had notice of Plaintiff's alleged disability. Accordingly, Plaintiff's failure to accommodate claim fails as a matter of law.

---

[3] As Defendant aptly argues, "the time of the termination decision is the relevant point at which to assess an employer's knowledge of an employee's alleged disability." *Vargas v. St. Luke's-Roosevelt Hosp. Ctr.*, 2020 WL 2836824, at *7 (S.D.N.Y. Jun. 1, 2020) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n.7 (2003)).

As Defendant notes, *Moore v. Time Warner GRC 9* is instructive on this point. 18 F. Supp. 2d 257 (W.D.N.Y. 1998). In *Moore*, the plaintiff, who suffered from diabetes and hypertension, informed his supervisors that he would miss two days of training due to his conditions. *Id.* at 261–62. Thereafter, the plaintiff missed additional training due to an emergency room visit, which he also informed his supervisors was due to his medical conditions. *Id.* After the plaintiff failed to attend the make-up training sessions for reasons unrelated to his conditions and received poor evaluations of his training progress, he was fired. *Id.* Unpersuaded by the plaintiff's claim that his employer was aware of his disability and discriminated against him on that basis, the court granted summary judgment in favor of the defendant, finding that that the "[m]ere knowledge that [the plaintiff] suffered from diabetes or hypertension [wa]s not equivalent to knowing that his condition 'disabled' him within the meaning of the ADA." *Id.* at 262.

Accordingly, Plaintiff's failure to accommodate claim fails as a matter of law.

## II.      Plaintiff's Discriminatory Discharge Claim

Defendant asserts that it is entitled to summary judgment as to Plaintiff's discriminatory discharge claim because the record indisputably reflects that Plaintiff's alleged disability played no role in her discharge. (Def.'s Mem. at 15–17.) Here again the Court agrees with Defendant.

To establish a *prima facie* case for discriminatory discharge, a plaintiff must show that: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability. *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001). Plaintiff argues that the timing of her termination, which was effected on July 9, 2013, the day that she returned from

9

sick leave, is evidence that she was terminated because of her disability. By way of review, Defendant's decision to terminate Plaintiff was initially drafted on June 20, 2013 – over a week before Plaintiff took the medical leave that she claims was the reason for her discharge. (Def.'s 56.1 ¶ 83; Pl.'s Reply 56.1 ¶ 83.) Here, the Court has already concluded that Defendant was not aware of Plaintiff's alleged disability before it made its decision to terminate Plaintiff. This fact alone is fatal to Plaintiff's claim. To state the obvious, Defendant could not have discharged Plaintiff because of a disability of which it was not even aware. *See Stola v. Joint Indus. Bd.*, 889 F. Supp. 133, 135–36 (S.D.N.Y. 1995) (finding that where an employer "acts without knowledge of the disability, it cannot reasonably be viewed as discriminating because of that disability") (internal quotation marks omitted); *Woolley v. Broadview Networks, Inc.*, 2003 WL 554754, at *8 (S.D.N.Y. Feb. 26, 2003) (granting summary judgment on an ADA claim because the employer did not become aware of the plaintiff's disability or desire for an accommodation until more than a month after the employer decided to terminate the plaintiff).

Even if Plaintiff had established that Defendant was aware of her alleged disability, she points to no evidence that her termination, or the culminating disciplinary events, occurred because of her disability. Instead, it is undisputed that Plaintiff received two written warnings related to her noncompliance with Defendant's policies in July and October 2012, months before Plaintiff experienced an elevated hypertensive condition. (Def.'s 56.1 ¶¶ 19, 28; Pl.'s Reply 56.1 ¶¶ 19, 28.) The placement of Plaintiff's branch on Early Warning in March 2013, following a February 2013 site visit, was similarly unrelated to any alleged disability, and Plaintiff conceded that the evaluation was justified. Plaintiff does not even dispute that the document reflecting Defendant's decision to terminate her was initially drafted on June 20, 2013 – over a week before Plaintiff took the medical leave that she claims was the reason for her discharge. (Def.'s 56.1 ¶

10

83; Pl.'s Reply 56.1 ¶ 83.) Nowhere in the record regarding these disciplinary events is a suggestion that they were the result of anything but Plaintiff's unsatisfactory performance. Because Plaintiff is wholly unable to establish that she suffered an adverse employment action because of her alleged disability, her discriminatory discharge claim fails as a matter of law. *See Giordano,* 274 F.3d at 747.

### III. Plaintiff's Retaliation Claim

Defendant contends that the Court should grant summary judgment in its favor as to Plaintiff's retaliation claim because Plaintiff fails to establish that she engaged in any legally protected activity. (Def.'s Mem. at 21–22.) The Court agrees. To establish a *prima facie* case for retaliation under the ADA, a plaintiff must show that: (1) she engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). Because Plaintiff does not show that she engaged in an activity protected by the ADA, her retaliation claim also fails as a matter of law.

Plaintiff argues that Defendant terminated her in retaliation after she took medical leave. This argument fails because Plaintiff's use of sick time pursuant to Defendant's leave policy does not constitute protected activity. *See Nassry v. St. Luke's Roosevelt Hosp.*, 2016 WL 1274576, at *12 (S.D.N.Y. Mar. 31, 2016) (the plaintiff did not engage in protected activity when he informed his employer that he was going to be absent pursuant to the employer's sick leave policy); *Prisco v. Air Indus. Grp.*, 2017 WL 9485663, at *13 (E.D.N.Y. Sept. 1, 2017), *report and recommendation adopted*, 2017 WL 4417665 (E.D.N.Y. Sept. 30, 2017) (where "the [p]laintiff merely asked for, and was granted, a half day off" and nothing "indicat[ed] that he asked for such

11

leave as an accommodation for any disability, . . . such leave, c[ould] not under the circumstances in this matter constitute protected activity under the ADA"). Because the record does not reflect that Plaintiff engaged in any protected activity, this claim fails as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED as to all of Plaintiff's claims.

SO ORDERED.

Dated: October 28, 2024  
Brooklyn, New York

/s/ LDH  
L<small>A</small>SHANN D<small>E</small>ARCY HALL  
United States District Judge